[Civil No. 2891. Filed March 24, 1930.]

[285 Pac. 1034.]

AUTOMATIC REGISTERING MACHINE COM-
PANY, INC., a Corporation, Appellant, v. PIMA
COUNTY, a Municipal Corporation, Appellee.

Messrs. Curley & Pattee, for Appellant.

Mr. Ben C. Hill, for Appellee.

LOCKWOOD, C. J.—On December 4th, 1928, a contract was made between the Automatic Register-ing Machine Company, Inc., a corporation, herein-after called appellant, and Pima county, hereinafter called appellee, acting through its board of super-visors, providing for the purchase of some forty vot-ing machines. The purchase price was the sum of

$43,420.80, to be paid in eight annual installments of certain amounts. The machines were duly shipped to Tucson by appellant and tendered to appellee; but the board of supervisors in the meantime had changed its membership, and declined to accept the machines, claiming the contract of purchase was invalid. In order to settle this controversy, appellee brought suit under the Uniform Declaratory Judgment Act of 1927 to determine the validity of the contract. In its complaint, appellee claimed the contract was void on three grounds: (a) That it was entered into without advertising for bids; (b) that at the time it was made the terms of office of the then supervisors were about to expire, their successors having already been elected; and (c) that, in the county budget for the fiscal year during which the contract was made, there was no provision for the purchase of voting machines or of any fund from which such purchase could be made. The appellant answered, admitting in substance the material allegations of the complaint, and the matter was submitted to the court upon the pleadings and various statements of counsel made in open court. Judgment was thereafter rendered declaring that the contract was invalid; whereupon appellant has brought the case before us for review.

There are some six assignments of error, but, upon examining the record and the law applicable thereto, we think we need consider only the third, which raises the question of whether or not chapter 52, Session Laws of 1921, commonly known as the Budget Law, is applicable to the contract in question, under the facts of the case. The position of appellant on this particular phase of the case is that, while the Budget Law applies to all ordinary county expenditures and liabilities, and under our decision, in the case of *Bank of Lowell* v. *Cox*, 35 Ariz. 403, 279 Pac. 257, any liability incurred in violation of

the terms of such law is void. Chapter 68, Session Laws of 1927, under which authority to make the contract in question is claimed, by implication makes the purchase of voting machines an exception to the Budget Law. The position of appellee, on the other hand, is that the two laws are harmonious and consistent, and that the Budget Law applies to the purchase of voting machines in the same manner as it does to any other county expenditure.

The particular provisions of chapter 68, *supra,* relied upon by appellant, read as follows:

"Section 5. Payment for Machines. The local authorities upon the adoption and purchase of voting machines, shall provide for the payment therefor in such manner as they may deem for the best interest of the locality and may for that purpose issue bonds, certificates of indebtedness or other obligations which shall be a charge on the county, city, town or village. Such bonds, certificates or other obligations may be issued with or without interest, payable at such time or times as the authorities may determine, but shall not be issued or sold at less than par."

It is urged that this gives unlimited authority to the board of supervisors to make any contract of any nature they see fit, so far as payment for voting machines is concerned, free from the limitations of the Budget Law.

In determining the true meaning of a statute the great fundamental rule is to ascertain and give effect to the intention of the legislature. *Deyo* v. *Arizona Grading etc. Co.,* 18 Ariz. 149, L. R. A. 1916E 1257, 157 Pac. 371; *Hicks* v. *Krigbaum,* 13 Ariz. 237, 108 Pac. 482; 36 Cyc. 1106; 25 R. C. L. 960. This intent is, of course, determined primarily from the language of the statute itself, and, when that is plain and unambiguous and conveys a clear and definite meaning there is no occasion for resorting to the rules of statutory construction. The statute must be given

its plain and obvious meaning. *Board of Lake County Commrs.* v. *Rollins,* 130 U. S. 662, 32 L. Ed. 1060, 9 Sup. Ct. Rep. 651; *Miles* v. *Wells,* 22 Utah 55, 61 Pac. 534; *Goble* v. *Simeral,* 67 Neb. 276, 93 N. W. 235; 25 R. C. L. 962. But where a literal interpretation would lead to injustice, absurdity or contradictions, or where the language is of doubtful meaning, it is the primary duty of the court to ascertain the legislative intent, and for this purpose to apply the various rules of statutory construction. *Hicks* v. *Krigbaum, supra; State Mut. Ins. Co.* v. *Clevenger,* 17 Okl. 49, 87 Pac. 583; *State* v. *Chicago & N. W. Ry. Co.,* 128 Wis. 449, 108 N. W. 594; *E. R. Darlington Lumber Co.* v. *Missouri Pac. Ry. Co.,* 216 Mo. 658, 116 S. W. 530; 36 Cyc. 1107.

If section 5, *supra,* is given its literal meaning, it is in conflict, not only with the Budget Law, but with the Constitution of Arizona itself. Article 7, section 13, of the last-named document, reads as follows:

"Section 13. Questions upon bond issues or special assessments shall be submitted to the vote of property taxpayers, who shall also in all respects be qualified electors of the State, and of the political subdivision thereof affected by such question."

That the clause in section 5, *supra,* authorizing the issuance of bonds by the local authorities, if construed literally, violates this provision, needs no argument. The term "certificate of indebtedness" is not defined by the statute. Under some decisions it is held to be the equivalent of a bond. *Christie* v. *City of Duluth,* 82 Minn. 202, 84 N. W. 754. If that be the true definition here, it is necessarily subject to the same constitutional limitations. What is the meaning of the words "other obligations"? By the rule of *ejusdem generis* they would be placed in the same class as the bonds and certificates of indebtedness. If the section is to be saved at all, it must be

by the use of some of the principles of statutory construction and not by a simple application of its plain and unambiguous terms. If it be urged that the words "and may for that purpose issue bonds, certificates of indebtedness or other obligations," etc., can be stricken without affecting the validity of the preceding part of the section, and that having done that we have a plain and unambiguous law needing no interpretation, the answer is that the only excuse for striking out a portion of a statute as unconstitutional and sustaining the remainder is that it is presumed as a rule of statutory construction the legislature would have enacted the remainder of the law, even had it known the part stricken would be declared unconstitutional. But in order to sustain this presumption, we must depart from the literal language of the statute; and if once we do this, to seek an intent not disclosed in such language, all rules which aid in determining that intent should be considered, and not one alone.

If, on the other hand, it be said that the section implies the various obligations mentioned therein are to be issued in accordance with the provisions of article 7, section 13, *supra,* and the general statutes providing for bond elections thereunder, we have again departed from the plain terms of the law in search of an implied intent of the legislature, and must continue our search until the entire intent is found, and not merely part thereof. We think, therefore, section 5, *supra,* is either unconstitutional as a whole— in which case the Budget Law unquestionably applies to the contract in question in this action—or else an investigation of the true intent of the legislature, not only as to the part of the section which is unconstitutional on its face, but as to the entire section, is required.

It is our duty to hold a statute constitutional if it is possible to do so on any reasonable interpretation

thereof. *Coggins* v. *Ely,* 23 Ariz. 155, 202 Pac. 391. We therefore proceed to determine, if it may be done, the true intent of the legislature, and whether or not that intent can be reconciled with the Constitution. What, then, was such intent? There are three possible answers to the question. One is that the legislature intended just what it said, and that section 5, *supra,* was to stand or fall as a whole, regardless of any constitutional or general statutory provisions in conflict therein. A second is that it meant to except the purchase of voting machines from all limitations so far as legally possible, but that, if any exceptions granted in terms or by implication were found to be unconstitutional, it desired the section to stand as nearly as possible as written, with only those exceptions eliminated which were in conflict with the Constitution. The third is that the powers granted the local authorities by section 5, *supra,* were meant to be subject to all general statutory as well as constitutional limitations then existing. If the first or the third theory represents the intention of the legislature, the Budget Law unquestionably applies to the contract in question, and the latter is void. If the second was its true meaning, the contract is valid so far, as that law is concerned.

There are certain rules of statutory construction which seem of particular value in determining the question at issue. First, when a general act has established a system of law covering a vital field in government, a repeal of or exception to such general system will not be readily implied. *State* v. *State Board of Canvassers,* 159 Wis. 216, Ann. Cas. 1916D 159, 150 N. W. 542; *Fussell* v. *Gregg,* 113 U. S. 550, 28 L. Ed. 993, 5 Sup. Ct. Rep. 631; *United States* v. *Barnes,* 222 U. S. 513, 56 L. Ed. 291, 32 Sup. Ct. Rep. 117.

Second, in determining the intent of the legislature, the court may consider both prior and subsequent

statutes *in pari materia. Coggins* v. *Ely, supra; Cape Girardeau County Court* v. *United States,* 118 U. S. 68, 30 L. Ed. 73, 6 Sup. Ct. Rep. 951; *United States* v. *Freeman,* 3 How. 556, 11 L. Ed. 724; *Campbell* v. *Youngson,* 80 Neb. 322, 114 N. W. 415; *Indianapolis Northern Traction Co.* v. *Ramer,* 37 Ind. App. 264, 76 N. E. 808.

Third, even though two acts are seemingly contradictory or repugnant, they are, if possible, to be given such a construction that both may be given effect. *Gideon* v. *St. Charles,* 16 Ariz. 435, 146 Pac. 925; 25 R. C. L. 919; 36 Cyc. 1149.

In applying the first rule of construction above stated, the case of *Bank of Lowell* v. *Cox, supra,* is in point. Therein we review the history of the Budget Law and show clearly that it was the culmination of a long series of attempts on the part of the legislature to accomplish a definite purpose governing a vital field in our government, to wit, to prevent the counties and municipalities of the state from incurring any liabilities without having first given the taxpayers a chance to protest. To hold that such a long-considered and definitely established policy was set aside by implication through the terms of an act providing for the purchase of an object which was by no means a public necessity, but merely an optional experiment, would be in our opinion contrary to the principle of statutory interpretation just referred to, unless the intent of the legislature is so clearly expressed that no other meaning can be given the statute.

As bearing on the second rule, the legislature of Arizona in 1925 ordered a codification of the existing law of the state. The new code was finally completed and adopted January 5, 1929, and included both the Budget Law and chapter 68, *supra.* The language of the Budget Law was greatly simplified, but the substance—so far, at least, as the features

applicable to the question now under consideration are concerned—was left unchanged. Section 5, *supra,* of chapter 68 was eliminated entirely, thus placing beyond doubt the future purchase of voting machines under the Budget Law in like manner as any other county charges. In view of the statement in the act providing for codification that the code commissioner was not to make any change in existing law, but was only to harmonize, reduce in language, and remove inconsistencies therein, we think the new code is a clear expression of legislative intent that the Budget Law was at all times intended to apply to the purchase of voting machines, and that section 5, *supra,* was eliminated because it merely was cumulative and conferred on the local authorities a power existing in its absence, to wit, to purchase voting machines whenever their use was approved, in the same manner as that provided by law for any other legitimate county purchase.

While there are few, if any, authorities on all fours with the case at bar, there are some which may give light on the principle involved. So far as we have been able to ascertain, there are but four cases which discuss the effect of a prior general statute regulating the expenditure of public money on a subsequent special statute authorizing the purchase of voting machines. In the states of New York, Michigan and Illinois, statutes authorizing the adoption of voting machines were passed which contained language practically identical with the first clause of section 5, *supra,* of the Arizona statute. Each of these states had prior general provisions of law limiting the manner in which contracts incurring liability on the part of municipalities should be made. In each state an attempt was made to purchase voting machines without first complying with the general statute, and, litigation arising, the contention was made, as in the case at bar, that the provisions of

the special statute were an exception to those of the prior general one. The Supreme Court of Michigan held, in accordance with the contention of appellant herein, that the later special statute by implication did make the method of purchasing voting machines an exception to the general law. *Darling* v. *City of Manistee,* 166 Mich. 35, 131 N. W. 450; *Cogswell* v. *City of Escanaba,* 176 Mich. 156, 142 N. W. 549. In the case of *People* v. *City of Geneva,* 98 App. Div. 383, 90 N. Y. Supp. 275, the court held that the general law prevailed, and that a special statute, though a subsequent one, did not take the purchase of voting machines out of the rule laid down in the prior general one. The same question arose in the state of Illinois, and in the case of *Empire Voting Machine Co.* v. *City of Chicago,* (C. C. A.) 267 Fed. 162, the court considered the New York and Michigan rules above referred to, and interpreted the Illinois act, which was in the precise language of section 5, *supra,* as merely authorizing the local authorities to determine the *form* of the indebtedness, rather than granting authority to *create* the debt contrary to the provisions of the general law. We are of the opinion that the reasoning in the case last cited applies with even greater force to the Budget Law of Arizona than to the appropriation law of Illinois, and that the authority to incur indebtedness for the purchase of voting machines under chapter 68, *supra,* is subject to the provisions of the Budget Law in the same manner as indebtedness for any other county purchase.

We hold, therefore, that the purchase of the voting machines involved in this case was subject in all respects to the provisions of the Budget Law; and, those provisions not having been complied with, the contract attempting to create an indebtedness on behalf of the county of Pima was void. In view of our opinion on this issue, it is not necessary that we consider the other points raised on the appeal.

The judgment of the superior court of Pima county is affirmed.

McALISTER and ROSS, JJ., concur.