EMPIRE VOTING MACH. CO. v. CITY OF CHICAGO et al.*

(Circuit Court of Appeals, Seventh Circuit.    March 30, 1920.    Rehearing Denied June 5, 1920.)

No. 2680.

1. **Municipal corporations ☞868(1)—Appropriation must precede municipal expenditure.**

In Illinois no recovery can be had on a municipal contract, where no previous appropriation was made, as required by Cities and Villages Act Ill. art. 7, § 4, in view of Cr. Code Ill. § 208.

2. **Municipal corporations ☞868(1)—Board of election commissioners may not contract without appropriation; "officers"; "departments of corporation."**

Cities and Villages Act Ill. art. 7, § 4, requiring appropriation, before any contract is made or expense incurred by municipal "officers" or "departments of the corporation," applies to the board of election commissioners; they being included within the terms "officers" or "departments of the corporation."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Department; Officer.]

3. **Municipal corporations ☞859—Statute requiring appropriation before municipal expenditures not repealed or amended; "expenses.".**

Cities and Villages Act Ill. art. 7, § 4, requiring appropriation before municipal expenditure, was not amended or partly repealed by the City Election Law or the Voting Machine Law, as respects the power of the board of election commissioners to contract for voting machines without prior appropriation by the municipal authorities; section 5 of the Voting Machine Law, authorizing the local authorities to determine manner of paying for voting machines, not being inconsistent with the requirement of prior appropriation, and the purchase price of voting machines not being covered by the word "expenses" in City Election Law, art. 7, § 1, providing that all "expenses" incurred by the board of election commissioners shall be paid by the city.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Expenses.]

4. **Statutes ☞224—Construction may be aided by considering subsequent legislation.**

While an act must be construed as of the date of its passage, subsequent legislation may be considered in determining the intent of the prior enactment.

5. **Estoppel ☞62(6)—City held not estopped to deny validity of contract for voting machines.**

The city of Chicago *held* not estopped to deny the validity of a contract for voting machines, in a suit for balance of their purchase price, by acceptance and payment for 200 machines delivered under the contract, and acceptance by the board of election commissioners of 300 more for the price of which the suit was brought, or by the action of the state board of election commissioners in certifying that that particular kind of machine complied with the requirements of the Voting Machine Act; the seller having relied solely on its contract and the certificate from the state board.

6. **Estoppel ☞56—Party relying on estoppel must have been induced to change his position.**

To establish an estoppel the party asserting it must be induced to act through such conduct of the other party as to make it unconscionable for the latter party to repudiate his position.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 254 U. S. ——, 41 Sup. Ct. 14, 65 L. Ed. ——.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Action by the Empire Voting Machine Company against the City of Chicago and others. Judgment for defendants, and plaintiff brings error. Affirmed.

Stephen A. Foster and Herbert Pope, both of Chicago, Ill., for plaintiff in error.

F. B. Johnstone, Horace Kent Tenney, and Leon Hornstein, all of Chicago, Ill., for defendants in error.

Before BAKER, ALSCHULER, and EVANS, Circuit Judges.

EVANS, Circuit Judge. Plaintiff in error, hereinafter termed plaintiff, instituted this action to recover a money judgment, basing its cause of action upon a contract executed July 21, 1911, between it and the board of election commissioners of the city of Chicago, hereinafter called the board, whereby 1,000 Empire voting machines were purchased for the specified price of $942,500. The contract was made after the board had received bids from various manufacturers and had examined various machines. The type selected had been examined and approved by the Illinois state voting machine commission.

The contract provided for the delivery of 200 machines on or before 8 months from the date of the contract, 300 on or before 15 months from the date of the contract, 200 on or before 21 months from the date of the contract, and 250 on or before 26 months from the date of the contract. Plaintiff delivered 200 of the machines between February and April, 1912, for which it was paid in two installments; the last payment being made in April, 1912, and after 192 of the machines had been used in the April primary election. The 300 machines were delivered shortly thereafter. A taxpayer's suit was then begun to restrain the board and the city from carrying out the agreement, and such suit was shortly followed by this action to recover the contract price for the 300 machines. The District Court directed a verdict in defendant's favor.

The city of Chicago, herein called the defendant, sought by way of counter relief to recover the purchase price of the 200 machines, but at the close of the testimony withdrew this issue.

Numerous questions, both of law and of fact, are presented on this writ of error; but in our view of the case it will be necessary to consider but one of them. Defendant denies plaintiff's right to recover, because the board had no power to bind defendant without a prior appropriation by the city council having been made to cover the purchase price of the voting machines. That no such prior appropriation had been made is conceded.

[1] Two sections of the Illinois statutes are relied upon in support of this defense. Section 208 of the Criminal Code of Illinois (Hurd's Rev. St. 1917, c. 38) reads:

"Every person holding any public office (whether state, county or municipal) * * * who shall be guilty of contracting directly or indirectly, for the expenditure of a greater sum * * * of money than may have been, at the time of making the contracts, appropriated or set apart by law or au-

thorized by law to be contracted for or expended upon the subject matter of the contracts * * * shall be fined not exceeding $10,000, and may be removed from his office. * * *"

And article 7, section 4, of the Cities and Villages Act (Hurd's Rev. St. 1917, c. 24, § 91) reads as follows:

"No contract shall be hereafter made by the city council or board of trustees, or any committee or member thereof; and no expense shall be incurred by any of the officers or departments of the corporation, whether the object of the expenditure shall have been ordered by the city council or board of trustees or not, unless an appropriation shall have been previously made concerning such expense, except as herein otherwise expressly provided."

Statutes or constitutional provisions quite similar to the last quoted section are common. Green et al. v. City of Everett, 179 Mass. 147, 60 N. E. 490; Commonwealth v. Foster, 215 Pa. 177, 64 Atl. 367; Mineralized Rubber Co. v. City of Cleburne, 22 Tex. Civ. App. 621, 56 S. W. 220; Fabric Fire Hose Co. v. City of Teague (Tex. Civ. App.) 152 S. W. 506. They have uniformly been held to be mandatory. If contracts are made in defiance of this statutory requirement, they are void. Hurley v. Trenton, 66 N. J. Law, 538, 49 Atl. 518, affirmed 67 N. J. Law, 350, 51 Atl. 1109; Roberts v. City of Fargo, 10 N. D. 230, 86 N. W. 726; Kelly v. Broadwell, 3 Neb. Unof. 617, 92 N. W. 643.

The section under consideration has been frequently before the Supreme Court of Illinois, and the right to recover without such appropriation has been denied. May v. City of Chicago, 222 Ill. 595, 78 N. E. 912; Litz v. Village of Hammond, 230 Ill. 310, 82 N. E. 634; Gathemann v. City of Chicago, 263 Ill. 292, 104 N. E. 1085. The wisdom of this legislation cannot be doubted. It localizes official responsibility for municipal indebtedness and makes intelligent action by the appropriating body of a city possible.

[2] But plaintiff contends that:

(a) Article 7, section 4, of the Cities and Villages Act does not apply to the board of election commissioners.

(b) That if the word "officers," as used in this section, is construed to include the board of election commissioners, the City Election Law (Hurd's Rev. St. 1917, c. 46, §§ 155–287e45) and the Voting Machine Law (Hurd's Rev. St. 1917, c. 46, §§ 430–451) are inconsistent therewith, and should be construed as amendments or as exceptions to said section.

(c) The city is estopped to assert the invalidity of its contract.

Contending that the duties of the board under the Voting Machine Act call for independent action, and that article 7, section 4, of the Cities and Villages Act, if applicable to the board, would destroy such independence, plaintiff asks for a construction in harmony with the purpose of the act.

But does it follow that such freedom is attainable only by the city's surrender of the control of its purse strings? The Cities and Villages Act has long been in force. Since 1875 it has been expressive of the public policy of the state of Illinois toward the debt-creating body of the municipalities of the state. If this policy were to

be abandoned in whole or in part, it is hardly conceivable that the Legislature would have expressed its intention inferentially and by indirect legislation. The power of the board or any other municipal board to create debt for the city or incur expense must somewhere be traced to legislative enactment and the extent of such power will be strictly construed.

While the board is authorized to determine the advisability of using voting machines and to select the kind of machine to be used, there is no authority on its part to vote appropriations, make assessments or otherwise provide for the payment of its obligations. These last-named duties rest with the city council, subject again to certain limitations. For the board to report its recommendations to the council, the only tax-voting body, and to secure appropriations for its needs prior to incurring indebtedness, is not surrendering to the council its independence nor its duties, any more than it would be to surrender to the county judge who appoints the members of the board in any given county, the prerogative of the office. True the council may refuse an appropriation notwithstanding the board is satisfied that voting machines are productive of accuracy in election counts and tend to eliminate frauds in elections. But such contentions can hardly outweigh the reasons which induced the Legislature to enact section 4 of article 7 of the Cities and Villages Act. It is hardly necessary to suggest the possibilities that would result from a policy that permitted various boards, in addition to the city council, to incur unlimited indebtedness or appropriate money without limit.

But this is a question of statutory construction. The wisdom of such legislation was for the lawmaking body to determine. We are interested in construing the legislation and ascertaining the legislative intent as expressed therein. Are the members of the board "officers" of the city of Chicago, or can it be said that the board is a "department of the corporation"? Plaintiff answers this query in the negative.

In enacting this legislation, the state of Illinois was endeavoring to check irresponsible officials and make possible intelligent action by the taxing and debt creating body of the city. Could it possibly have been intended that "officers" and "departments" of a city were powerless to act without a prior appropriation, yet others could bind the municipalities without prior appropriation? Or could it have been intended by this Legislature to deny to a "Department" or "Officer" of the city the right to incur debt, yet to permit a board which was but a quasi city department to burden the municipality with unlimited debt without first obtaining an appropriation from the council? To state either question is to answer it. The Legislature intended no narrow or limited definition of the words "officers" or "departments of the corporation," when it prohibited them from incurring debt or creating expenses without a prior appropriation by the council.

Moreover, the status of the members of the board has been defined by the Supreme Court of Illinois on at least two occasions. People v. Board of Commissioners, 260 Ill. 345, 103 N. E. 282; Wetherell v. Devine, 116 Ill. 631, 6 N. E. 24. In the former case, after referring

to the holding in Wetherell v. Devine, that the election commissioners were corporate authorities, the court said:

"It was declared that they are such corporate authorities because they are appointed in a mode to which the municipality has given consent * * * and it necessarily follows that they are officers of the municipality within and for which they are appointed. The appellants were officers appointed for a definite term of office, for the exercise of certain powers and the performance of certain duties under the laws of the state, in and for the city of Chicago and the town of Cicero, and they cannot be distinguished in any manner from other officers occupying public positions created by the law, all of whom are municipal officers within the meaning of the Constitution."

True, in that case the court was not construing the word "officer" as used in article 7, section 4, of the Cities and Villages Act, but it was defining the status of the members of the board.

Bearing in mind the purpose of the legislation and the object to be accomplished, we conclude that the word "officers," as used in said section of the Cities and Villages Act, should be given its broadest and most comprehensive definition, and should include members of the election board.

[3] (b) As bearing upon the question of the effect of the City Election Act and the Voting Machine Act upon article 7, section 4 of the Cities and Villages Act, two cases are brought to our attention: People v. City of Geneva, 98 App. Div. 383, 90 N. Y. Supp. 275, and Darling v. City of Manistee, 166 Mich. 35, 131 N. W. 450. These two courts, construing very similar acts, reached exactly opposite conclusions. In the Michigan case, however, it is apparent that an extreme situation was presented. The court in passing upon this question said:

"We are of the opinion that the provisions of the city charter cited do not apply to the purchase of voting machines provided for by separate and distinct acts, and that contracts made in conformity with the provisions of the act should be held valid, although not in conformity with general provisions of the charter. * * * The provisions as to the purchase of, and payment for, the machines are inconsistent with the view that the Legislature intended that appropriations for their purchase should precede their acquisition."

In that case, however, an appropriation was sought prior to the purchase of the voting machines. The city council by a vote of 7 to 4 out of a membership of 14 voted the appropriation. There were 3 members of the council absent, and the validity of this action was therefore assailed. Later the contract was executed, and a claim for the purchase price of the machines was presented, and by the unanimous vote of the council duly allowed. The voting machines were in the possession of the city. They had been intelligently accepted after fair trial, and the equities were strongly in favor of the ultimate conclusion reached by the court.

In the New York case the questions were more fully and elaborately considered in the opinion, the various arguments separately considered, and the conclusion reached that a voting machine act did not operate either as an amendment to, or a partial repeal of, the general act prohibiting the creation of a debt without the prior appropriation by the council.

In the present case plaintiff specially invokes section 5 of the Voting Machine Act in support of its position. It reads:

"The local authorities, on the adoption and lease or purchase of a voting machine or voting machines, may provide for the payment therefor in such manner as may be deemed for the best interest of the city, village, incorporated town or county. They may for that purpose make leases, issue bonds, certificates of indebtedness, or other obligations, which shall be a charge on the city, village, incorporated town or county. Such bonds, certificates or other obligations may be issued with or without interest, payable at such time or times as the authorities may determine, but shall not be issued or sold at less than par."

Commenting upon this section, the District Judge appropriately observed:

"This section, as I view the law, provides for the disposal of the question of compensation by provision other than by the payment of cash, and authorizes the city or county in the event that cash is not to be paid but something else is to be substituted in the place of cash, to issue bonds or certificates of indebtedness. It does not repeal the Cities and Villages Act provisions respecting an antecedent appropriation, and is in entire harmony with it, and can be in full force and effect with the city and village antecedent appropriation requirement."

The authority to determine the form of an indebtedness is one thing, but the authority to create the debt without the prior appropriation by the city council is quite another matter. We fail to see anything inconsistent with this grant and the requirement that, before a binding obligation can be created, action by the city council must be invoked.

Plaintiff also relies on section 1 of article 7 of the City Election Act for its express authority to purchase the voting machines. This section reads in part:

"All expenses incurred by such board of election commissioners shall be paid by such city. Such salaries and expenditures are to be audited by the county judges, and such salaries shall be paid by the county treasurer, upon the warrant of such county judge, of any money in the county treasury not otherwise appropriated, and such expenditures shall be paid by the city treasurer, upon the warrant of such county judge, out of any money in the city treasury not otherwise appropriated. It shall also be the duty of the governing authority of such counties and cities respectively to make provision for the prompt payment of such salaries and expenditures, as the case may be."

It is claimed that the word "expenses," as here used, covers the purchase price of voting machines. Is this justifiable? The court defined the word "expenses" in the case of Wetherell v. Devine, 116 Ill. 631, 6 N. E. 24:

"The expenses incurred by the election commissioners, which the city is required to pay, are for office rent, clerk hire, stationery, printing, books, registers, poll lists, blanks, ballots, ballot boxes, etc."

While this language is inclusive rather than exclusive, it must be conceded that the court would be required to take a long step before the word "expenses," which included "office rent, clerk hire, stationery, printing, books, registers, poll lists, blanks, ballots, ballot boxes, etc." would also include the purchase price of voting machines. In other words by the Election Act the election board might well have been

authorized to bind the county for salaries of employés, etc., and to bind the city with expenses such as office rent, clerk hire, stationery, printing, books, registers, poll lists, blanks, ballots and ballot boxes, and yet not be authorized to incur a $1,000,000 debt for voting machines. In fact, if authority may be found in this section for purchasing voting machines, then there unquestionably exists authority in the same section for creating a debt of five times $1,000,000 for the same purpose.

[4] Again, if the board was authorized by this section to purchase voting machines, why did the Legislature give express power to purchase voting machines by the Voting Machine Act? While it may be fairly admitted that the City Election Act under consideration must be construed as of the date of its passage, subsequent legislation by the Illinois Legislature may be considered in helping us determine the intent of the prior enactment. Farmers' & Mechanics' National Bank v. Dearing, 91 U. S. 29, 23 L. Ed. 196; Cape Girardeau County Court v. Hill, 118 U. S. 68, 6 Sup. Ct. 951, 30 L. Ed. 73; Grahl v. United States (C. C. A.) 261 Fed. 487.

Basing our conclusion upon the judicial definition of expenses which we have quoted and also upon the legislative intent as gathered from a reading of the two acts, we feel justified in denying the board's power to purchase voting machines under section 1 of article 7 of the City Election Act. It therefore becomes unnecessary for us to consider the effect of the other provision of the City Election Act, which calls for the payment of such expenditures "out of any moneys in the city treasury not otherwise appropriated."

[5] (c) *Estoppel.*— The contract was made July 2, 1911. Two hundred machines were delivered between February and April, 1912, and the 300 for the purchase price of which this action was begun were delivered between June 14, 1912, and October 23, 1912. One hundred and ninety-two machines were used in the 1912 spring elections and the last payment for the 200 machines was made shortly thereafter. Some 460 machines were used in November, 1912, and 134 were used in the election held in April, 1913. The 300 machines delivered in the summer of 1912 were received by the board, which, so far as it was able so to do, accepted them, stored them away, and not until after this suit was commenced were they tendered back to the plaintiff. In fact, until there was a change in the personnel of the board, that body insisted that it had accepted the machines and the city was bound to pay for them.

It appears that in one of the elections, wherein some of these machines were used an unusual test was given. Many referendum questions, some of unusual length were submitted. The candidates were numerous, and voters not infrequently used the machine more than a minute. Whether this fact evidenced a failure of the machine to comply with the statutory requirements (section 1 of the Voting Machine Act), or was the result of the voter's failure to properly study the ballot before attempting to use the machine, we do not decide. A similar question of fact was quite fully litigated in a case that reached the Illinois Supreme Court (People ex rel. Hull v. Taylor, 257 Ill.

192, 100 N. E. 534), and the court found that the machine did not meet the "one minute voting test" required by the statute. While this case is not conclusive upon either party before this court, it is interesting as showing the lack of satisfaction manifested after a trial of the machines. For the purposes of this opinion, however, we may assume that the machines operated to the satisfaction of the board, and that the members of the board were honestly persuaded that the machines were a success.

These facts conceded, was the city estopped to question the validity of the contract? The question is not whether a city may not estop itself under any circumstances, a position which plaintiff erroneously ascribed to defendant; but the query is: Do the facts in this case estop the city from asserting the defenses here under consideration?

That the mere making of the contract by the board and the acceptance of the machines by the board will not necessarily estop the city is, we think, quite clear. Badger v. Inlet Drainage District, 141 Ill. 540, 31 N. E. 170; Hope v. City of Alton, 214 Ill. 102, 73 N. E. 406; Chippewa Bridge Co. v. City of Durand, 122 Wis. 85, 99 N. W. 603, 106 Am. St. Rep. 931. If an officer may, in the absence of an appropriation by the council, obligate the city to pay a debt by merely contracting to buy a machine and accepting it when delivered, then section 4 of article 7, of the Cities and Villages Act is a comparatively valueless piece of legislation, and the safeguards that under this section were intended to surround the city treasury are mythical.

We are unable to find anything in the action of the state board of election commissioners in certifying that the Empire voting machine complied with the requirements of the Voting Machine Act that would in any way tend to estop the city. The state board examined various machines of different types, made by different manufacturers, and issued a certificate to each one that manufactured a machine that complied with the Voting Machine Law. No machine that failed to secure such an indorsement could be used in any election. Such a requirement was merely an extra precaution, which the state took to surround its elections. But by no stretch of the imagination could it be construed as a substitute for section 4 of article 7, of the Cities and Villages Act, or for a compliance in fact with those tests which the state board certified to in its certificate. People ex rel. Hull, supra.

The retention of the machines by the board is also advanced as grounds for an estoppel; it being urged that this action was with the knowledge and approval of the city. But the board occupied a peculiar position. While acting for the city in incurring certain expenses and in supervising its elections, it was singularly independent of the city government. In so far as it contracted for the city, the members were unquestionably acting as officers of the city and bound by all of the statutes and ordinances which regulate and limit the powers of such officers. But their duties related generally to elections, which not infrequently were of interest chiefly to the state, the county, and the nation. They were appointed by the county judge. Neither the mayor nor the city council had any approval or ratification of such appointment. They were city officials, and yet more. Their action was not subject

to that implied control or approval which usually marks the conduct of city officials. A payment of an unauthorized bill, when supported by the certificate of this board, backed by the warrant of the county judge, would not, therefore, have the significance that such a payment and such a retention of the machines might otherwise evidence.

But the city is not here seeking to recover the $200,000 paid for the first 200 machines. It is questioning plaintiff's right to recover for the second installment of 300 machines, for which an obligation of approximately $300,000 is claimed to have arisen against the city. Therefore acceptance and payment for the machines delivered under an unauthorized contract plus acceptance by the board of more machines under the same agreement raises the precise question of estoppel we must decide. The Illinois courts have answered this question in the negative. Chicago v. Shober Lithographing Co., 6 Ill. App. 560; Village of Harvey v. Wilson, 78 Ill. App. 544; Village of Marysville v. Schoonover, 78 Ill. App. 189; Keith v. DuQuoin, 89 Ill. App. 36; May v. City of Chicago, 222 Ill. 595, 78 N. E. 912; Roemheld v. City of Chicago, 231 Ill. 467, 471, 83 N. E. 291; Indiana Road Machine Co. v. Keeney, 147 Mich. 184, 110 N. W. 530; McQuillan, Municipal Corporations (1912) §§ 1164, 1180.

In the present case, while payment was made for the 200 machines before the 300 machines were delivered, it does not appear that the material for the 300 machines was purchased or that the machines were completed prior to such a payment. In fact, the president of the Empire Voting Machine Company admitted that he relied, not on the acceptance of the 200 machines by the board, or the payment of the purchase price therefor by the council, but solely upon his contract and the certificate of the state board heretofore referred to. This issue was squarely presented to him, and his replies were unequivocal. We quote from the testimony:

"Q. Mr. Lomb, in entering into this contract and manufacturing and delivering these machines, did you act upon the strength of and in reliance upon the report of the voting machine commissioners of the state of Illinois made to the effect that your type of Empire voting machine complied fully with the requirements of the statute?

"The Court: Did you act solely on their action? A. I think we did.

"Q. Solely? A. Yes, sir.

"The Court: Go ahead. I amended that as you wanted it, didn't I?

"Mr. Foster: That's all right, surely. I think you may cross-examine."

But we are inclined to go further. We think that a city whose right to incur obligations is limited by a prior appropriation therefor as prescribed by article 7, section 4, of the Cities and Villages Act, heretofore quoted, might, under a misapprehension of its rights and liabilities accept a part of the goods purchased under an unauthorized contract and make a partial payment for such delivery, and yet not be estopped by such payment from disputing claimant's right to recover on the balance of the contract. That there may be extreme cases warranting the opposite conclusion we will not deny.

But if we turn from case law, and apply to this record the ordinary tests for determining estoppel, we must find against the plaintiff.

[6] To establish an estoppel, the party asserting it must be induced

to act through such conduct of the other party as to make it unconscionable for the latter party to repudiate his position. Here plaintiff was not and could not have been influenced by the payment of the first 200 machines. It was no doubt moved to act by its contract with the board. It proceeded with the manufacture of its machines with dispatch, in order to meet the delivery dates named in the contract. As its president said, he secured a contract which called for the delivery of certain voting machines, and he proceeded on the strength of that contract, and upon the strength of the certificate from the state board, and upon nothing else.

We conclude that a prior appropriation by the city council was necessary, that the city is not estopped to assert the invalidity of the contract so far as it relates to the 300 machines under consideration, and that the judgment should be and it is hereby affirmed.